UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BRANDON HOLMES,

                        Plaintiff,

          v.

BRIAN FISCHER, Commissioner of the New York
State Department of Correctional Serv., LUCIEN
LeCLAIRE, Deputy Commissioner (DOCS), UNKNOWN
CORRECTIONAL LIEUTENANT (or Higher-Ranking
Authority), Elmira, NORMAN BEZIO, Special Housing
Unit/Disciplinary Director, KAREN BELLAMY, Assistant
Commissioner/Director of Department of Correctional
Services (DOCS), LUDQUIST, Acting Director of DOCS,
S.J. WENDERLICH, Deputy Superintendent of Security for
Elmira Prison, MARK BRADT, Superintendent of Elmira
Prison, INMATE GRIEVANCE SUPERVISOR ABRUNZO,
SOUTHPORT PRISON NURSE DYAL-WEAVER,
DOCTOR HENRY FOWLER, DOCTOR CANFIELD,
UNKNOWN INFORMANTS, ELMIRA PRISON, W.
ZIGENFRIS, Correctional Lieutenant, J. SMITH,
Correction Sergeant, PHILIP HEATH, Sing Sing Prison
Superintendent, and CATHY FELKER, Southport Prison
Nurse Administrator,

                        Defendants.
_____

REPORT
and
RECOMMENDATION
------------------------------
DECISION
and
ORDER

09-CV-00829S(F)

APPEARANCES:        THE REDDY LAW FIRM LLC
                        Attorneys for Plaintiff
                        PRATHIMA C. REDDY, of Counsel
                        455 Linwood Avenue
                        Buffalo, New York  14209

                        ERIC T. SCHNEIDERMAN
                        ATTORNEY GENERAL, STATE OF NEW YORK
                        Attorney for Defendants
                        DAVID J. SLEIGHT
                        Assistant Attorney General, of Counsel
                        350 Main Street
                        Suite 300A
                        Buffalo, New York  14202

## JURISDICTION

This case was referred to the undersigned on July 19, 2010, by Honorable William M. Skretny for all pretrial matters including preparation of a report and recommendation on dispositive motions.  The matter is presently before the court on Defendants' motion for summary judgment (Doc. No. 112), filed December 10, 2014, and Plaintiff's motion seeking to dismiss his court-appointed counsel (Doc. No. 125), filed December 17, 2015.[1]

## BACKGROUND

On September 22, 2009, Plaintiff Brandon Holmes, then proceeding *pro se*, commenced this civil rights action pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights based on incidents occurring in 2008 at Elmira Correctional Facility ("Elmira"), and between 2009 and 2010 at Southport Correctional Facility ("Southport"), where Plaintiff was then housed in the custody of New York Department of Corrections and Community Supervision ("DOCCS").  Plaintiff alleges Defendants, all DOCCS employees assigned to either Elmira or Southport, violated his civil rights, including his rights under the First, Fourth, Eighth, and Fourteenth Amendments, by subjecting Plaintiff to suspicionless, non-random urinalysis drug testing, improperly cuffing Plaintiff, sleep deprivation, failing to properly treat Plaintiff's cardiac complaints, failing to maintain an adequate health intervention program, delaying treatment of Plaintiff's wounds sustained in a physical altercation with another inmate, and interfering with Plaintiff's attempt to petition for redress of grievances, and further alleges claims for

---

[1] Although Defendants' motion seeking summary judgment is dispositive, whereas Plaintiff's request to dismiss his court-appointed attorney is nondispositive, the court addresses both motions in this combined Report and Recommendation/Decision and Order in the interests of judicial economy and convenience.

retaliatory harassment and conspiracy pertaining to Defendants' alleged unwarranted urinalysis drug testing.  On January 30, 2012, Plaintiff filed an amended complaint (Doc. No. 34) ("Amended Complaint").  Defendants' answer to the Amended Complaint was filed February 9, 2012 (Doc. No. 36).

By motion filed April 11, 2013 (Doc. No. 67), Plaintiff requested appointment of counsel, which request was granted by the undersigned on June 21, 2013 (Doc. No. 77), with Prathima C. Reddy, Esq. ("Reddy"), appointed to represent Plaintiff in connection with this matter.  Plaintiff's subsequent request filed November 6, 2013 (Doc. No. 92), to have Reddy discharged as Plaintiff's assigned counsel was denied by the undersigned on January 30, 2014 (Doc. No. 96) ("January 30, 2014 D&O").

On December 10, 2014, Defendants filed the instant motion for summary judgment (Doc. No. 112) ("Defendants' motion"), and supporting papers, including the Statement of Undisputed Facts (Doc. No. 113) ("Defendants' Statement of Facts"), attaching exhibits A and B (Docs. Nos. 113-1 and 113-2) ("Defendants' Exh(s). __"), the Declaration of Wesley Canfield, M.D. (Doc. No. 114) ("Dr. Canfield Declaration"), attaching exhibit B[2] (Doc. No. 114-1) ("Dr. Canfield Exh. B"), the Declaration of Stephen J. Wenderlich (Doc. No. 115) ("Wenderlich Declaration"), attaching exhibits A and B (Docs. Nos. 115-1 and 115-2) ("Wenderlich Exh(s). __"), and the Memorandum of Law in Support of Motion for Summary Judgment (Doc. No. 116) ("Defendants' Memorandum").  By letter to the undersigned dated November 24, 2015, and filed December 17, 2015 (Doc. No. 125) ("Plaintiff's motion"), Plaintiff complains that he repeatedly has failed to receive legal mail from his attorney, Reddy, which has

---

[2] Dr. Canfield's Exh. A is a volume containing Plaintiff's medical records which Defendants declined to electronically file, choosing instead to provide hard copies to Plaintiff's counsel and to the court for *in camera* review.  Dr. Canfield Declaration ¶ 3 and n. 1.

interfered with Plaintiff's meaningful participation in telephone calls with Reddy.

Plaintiff's motion at 1.[3]  Plaintiff further asserts there are several arguments he wishes to

raise in opposition to Defendants' motion for summary judgment, and requests Reddy

be dismissed as his counsel.  *Id.* at 1-2.  After several requests for extensions of time to

oppose summary judgment were granted, Plaintiff filed on November 30, 2015, the

Affirmation in Support of Plaintiff's Motion in Opposition of Defendant's Motion for

Summary Judgment (Doc. No. 123) ("Plaintiff's Affirmation"), attaching exhibits (Docs.

Nos. 123-1 through 123-6) ("Plaintiff's Exh(s). __"), and Plaintiff's Memorandum [of][4]

Law in Opposition to Defendant's Motion for Summary Judgment (Doc. No. 123-7)

("Plaintiff's Memorandum").  On December 30, 2015, Defendants filed the Memorandum

of Law in Further Support of Defendants' Motion for Summary Judgment (Doc. No. 126)

("Defendants' Reply").  Oral argument was deemed unnecessary.

     Based on the following, Defendants' motion should be GRANTED; Plaintiff's

motion is DENIED.

## **FACTS**[5]

     Between March 10, 2007, and November 28, 2008, Plaintiff Brandon Holmes

("Plaintiff" or "Holmes"), then incarcerated at Elmira Correctional Facility ("Elmira"), was

given eight "full scan" urinalyses ("the urinalyses"), of which two were random and six

---

[3] In another letter dated November 28, 2015, and filed December 14, 2015 (Doc. No. 124) ("November 28, 2015 Letter"), Plaintiff similarly asserts communication difficulties with Reddy including that Reddy "refuses to consider" Plaintiff's unspecified "meritorious input. . . ."  November 28, 2015 Letter at 2. Plaintiff also requests Reddy be censured and removed from this case if she cannot diligently defend [Plaintiff's] interests."  *Id.* at 4.  Because the November 28, 2015 Letter is not addressed to the undersigned, but is only a copy of a letter addressed to the Attorney Grievance Committee for the Fourth Department of New York Supreme Court, the court need not further consider it.
[4] Unless otherwise indicated, all bracketed material is added.
[5] Taken from the pleadings and motion papers filed in this action.

were based on suspicion.  Specifically, Plaintiff was required to submit to urine

specimen collection on March 10, 2007, pursuant to a March 10, 2007 request by

DOCCS Sgt. Tipton based on "suspicion – confidential information," Defendants' Exh. B

at Bates 000424, on July 13, 2007, pursuant to a July 10, 2007 request by DOCCS

Corrections Officer ("C.O.") K. Curren who observed Plaintiff with "glossey [*sic*] eyes

and slurred speech," *id.* at Bates 000425, on July 25, 2007, pursuant to a July 20, 2007

request by DOCCS Sgt. Thatcher because "confidential information indicates possible

drug use," *id.* at Bates 000426, on February 2, 2008, pursuant to a December 29, 2007

request by DOCCS Sgt. Hucul after "reliable confidential inmate stated that Holmes is

using and dealing illegal narcotics," *id.* at Bates 000427, on August 28, 2008 pursuant to

a August 27, 2008 request by DOCCS Sgt. Gregory Harvey ("Harvey"),[6] because

"confidential information indicates inmate is involved in contraband drug use," *id.* at

Bates 000429, and on November 22, 2008 pursuant to a November 18, 2008 request by

DOCCS Sgt. J. Smith following Plaintiff's "involve[ment] in fight with weapon utilized,

possibly due to drug involvement."  *Id.* at Bates 000002.  Urine samples were also

collected from Plaintiff for random full scan urinalyses on July 24, 2008 pursuant to a

July 7, 2008 request, and on August 30, 2008 pursuant to an August 11, 2008 request.

*Id.* at Bates 000428, 000430.   DOCCS Lt. Pierri made the requests for both random

tests.  *Id.*  All eight urinalyses yielded negative results.  For each specimen collection,

Plaintiff was required to urinate into a cup while observed by a DOCCS official which

Plaintiff maintains caused him stress resulting in insomnia, erectile dysfunction, nausea,

headaches, burning of eyes, dizziness, and loss of energy.  Plaintiff, who steadfastly

---

[6] Sgt. Harvey is not a Defendant to this action.

denies ever illegally using narcotics, asserts that each urinalysis procedure purportedly based on suspicion by an unidentified but reliable confidential informant was unfounded.

Following the February 2, 2008 collection of his urine specimen pursuant to the December 29, 2007 request, Plaintiff sought to obtain from Defendant Elmira Records Access Officer Palmiera ("Palmiera"), by a Freedom of Information Law ("FOIL") request records supporting the need for DOCCS's repeated urinalyses of Plaintiff, but Palmeira never supplied the requested information.[7]   On February 6, 2008, Plaintiff filed inmate grievance EL 33-913-08, dated February 2, 2008 ("First Grievance"),[8] challenging the repeated urinalyses as intended to sexually harass Plaintiff and asserting DOCCS officials should be required to assess the reliability of such confidential informants before requiring Plaintiff submit to urinalysis.  First Grievance, *passim*.  The First Grievance was investigated on February 10, 2008, by Defendant J. Smith ("Smith"), who reported the urinalyses to which Plaintiff was subjected were either based on information received that the inmate is or has used illicit drugs or alcohol, which would present a serious threat to the correctional facility's safety and security, or upon random selection by a computer generated program.  Investigative Report[9] at 1.  Smith further stated that despite concurring that Plaintiff should not be subjected to any form of harassment pertaining to urinalyses, information supplied by confidential sources must be investigated.  *Id.* at 2.  Plaintiff alleges that at a hearing on the First Grievance,[10] an unidentified DOCCS corrections officer and sergeant informed that the urinalyses to

---

[7] No copy of Plaintiff's FOIL request is in the record and Plaintiff does not further specify when he made the FOIL request.

[8] Plaintiff's Exh. 3 (Doc. No. 123-3).

[9] Plaintiff's Exh. 5 (Doc. No. 123-5).

[10] The record does not contain the date of such hearing or any other evidence that such hearing was held.

which Plaintiff was subjected did not amount to sexual harassment because a DOCCS official, lieutenant or higher, was required to order the urinalyses and no procedure was in place to test the confidential informant's reliability which could be confirmed or rebutted only by the urinalyses results.  Amended Complaint ¶ 11.  Plaintiff maintains that Defendant Lt. Zigenfris ("Zigenfris") merely "rubber-stamps" bogus urinalysis requests and refuses to implement a policy to avoid such concerns causing Plaintiff to question how, under these circumstances, the reliability of such informants could be deemed "reliable."  Amended Complaint ¶ 7.  Plaintiff also maintains that unless DOCCS's officials confirm the reliability of the confidential informants, it is essentially the confidential informants who submit the inmate for urinalysis.  *Id.*  Plaintiff further testified at the hearing that after each urinalysis, he experienced insomnia for weeks awaiting the urinalysis results and anxiety about a possible "false-positive" result.  *Id.* ¶ 8.

The First Grievance was initially denied on February 27, 2008.  By letter dated April 16, 2008 ("April 16, 2008 Letter"),[11] Defendant DOCCS Deputy Commissioner Lucien J. LeClaire, Jr. ("LeClaire"), advised Plaintiff that Defendant DOCCS Commissioner Brian Fischer ("Fischer"), had requested LeClaire respond to Plaintiff's letter regarding urinalyses, explaining that the urinalyses were conducted pursuant to DOCCS Directive 4937 – Urinalysis Testing ("Directive 4937"), a copy of which was available for Plaintiff's review in the correctional facility's law library.  LeClaire further advised that if Plaintiff was not satisfied with the response he received to the First Grievance, Plaintiff could file an appeal of the response.  *Id.*  On May 22, 2008, Plaintiff filed an appeal of the First Grievance's denial with the Inmate Grievance Resolution

---

[11] Plaintiff's Exh. 3 (Doc. No. 123-3), at 15.

Committee ("IGRC"), which was denied on June 3, 2008.  On June 5, 2008, Plaintiff

further appealed the decision to the Central Officer Review Committee ("CORC"), which

on July 25, 2008, upheld the IGRC's decision.  On July 27, 2008, less than 72 hours

after the CORC's decision, an "unknown lieutenant" approved a random urinalysis of

Plaintiff, Amended Complaint ¶ 12, which Plaintiff maintains was retaliatory because

absent a history of drug use, Plaintiff should not have even been on the random

urinalysis list.  Plaintiff filed another inmate grievance that same date ("Second

Grievance"),[12] asserting that the timing of the "random analysis" to which he was

subjected on July 27, 2008, indicated the urinalysis was not truly random but intended

as retaliation against Plaintiff for filing the First Grievance.

On August 27, 2008, both Plaintiff and another inmate, one "Gilmore" were

subjected to urinalysis based on suspicion.  The urinalysis results were negative as to

Plaintiff, but positive for Gilmore who was then required to undergo a disciplinary

hearing from which Plaintiff learned that the August 27, 2008 urinalysis was not properly

ordered because an unknown DOCCS official had forged Sgt. Harvey's signature to

order the test.  Although at Gilmore's disciplinary hearing Sgt. Harvey denied ordering

the urinalysis, Harvey later signed an affidavit stating he had ordered the August 27,

2008 urinalysis for Plaintiff, but averring he was unable to identify the confidential

informant who supplied the suspicion for which the urinalysis had been ordered.  On

August 30, 2008, Plaintiff was ordered to submit to a "random" urinalysis.  *Id.* ¶ 29.

On September 7, 2008, Plaintiff complained about the urinalysis to Wenderlich.

advising Zigenfris's approval was crucial to avoid procedural errors in ordering

urinalyses.  In October 2008, Plaintiff sought from one Dr. Brasselman ("Dr.

---

[12] Plaintiff's Exh. 3 (Doc. No. 123-3), at 22-23.

Brasselman"), medical treatment for sleeping problems which had caused Plaintiff to experience fatigue, nausea, headaches, burning eyes, inability to exercise, loss of appetite, and aggravation of an old gunshot wound, all of which Plaintiff attributes to the repeated urinalyses.  Dr. Brasselman diagnosed Plaintiff with hypertension.

On October 22, 2008, DOCCS Inspector General's Office received an "anonymous letter" accusing Plaintiff of "running a commissary, football tickets/ gambling," had assaulted other inmates, was a gang member, and had been targeted by another gang (the Bloods) to be stabbed.  Amended Complaint ¶ 32; Plaintiff's Exh. 6 (Doc. No. 123-6).  _Id._  According to the Inspector General's Office's Investigative Report, there was no evidence supporting the anonymous inmate's allegation and the inmate who made the allegation admitted he was without any proof that anyone planned to stab Plaintiff.  When an agent from the Inspector General's Office interviewed Plaintiff on November 5, 2008, regarding the physical threat, Plaintiff signed a waiver indicating he was offered but refused protective custody and the matter was closed.  _Id._

On November 17, 2008, Plaintiff, still housed at Elmira, was involved in a physical altercation ("the altercation"), with another inmate.  Plaintiff maintains he was attacked by another inmate wielding a metallic instrument, cutting Plaintiff several times in the head and face, and used force only in self-defense against his assailant. According to an inmate misbehavior report ("the Misbehavior Report"),[13] issued by Defendant Smith following the altercation, however, Plaintiff instigated the assault by running into the cell of inmate Paul Jolley ("Jolley"), where both Plaintiff and Jolley wrestled with each other.  Smith noticed that both inmates were injured and observed a bloodied, folded can lid on the floor of the cell which Smith secured by placing in a

---

[13] Wenderlich Exh. A (Doc. No. 115-1), at 3.

plastic bag and into his pocket.  The fighting inmates refused several direct orders to separate and spilled out to the gallery where they were separated by force and Plaintiff was then escorted to Elmira's medical unit for treatment of a 2" laceration on his left cheek, a 4" laceration on the back of his head, a 2 1/2" laceration on the right side of his head, and two ½" cuts on his right arm.  Plaintiff was later transported to the emergency room at Arnot Ogden Medical Center in Elmira, New York, for further treatment of his injuries and, upon returning to Elmira, was placed in the Special Housing Unit ("SHU").

In the Misbehavior Report, Plaintiff was charged with violating DOCCS Rules 100.13 (fighting), 104.11 (violent conduct), 106.10 (refusing a direct order), and 113.10 (weapon possession).  Wenderlich, one of the DOCCS officials to whom Plaintiff had directed his complaints regarding the urinalyses, presided over the Tier III disciplinary hearing held on the Misbehavior Report ("the disciplinary hearing").  The only witness Plaintiff requested testify at the disciplinary hearing was Jolley who refused to testify.  At the disciplinary hearing, Plaintiff denied provoking the altercation and also testified that the other inmate involved in the altercation was not Jolley whom Plaintiff described as "a short guy," but was instead "a big guy."  Hearing Tr.[14] at Bates 000013-15, 000033 (describing his assailant as "much taller" than Jolley).  Wenderlich denied Plaintiff's request to view video surveillance of the altercation, asserting there were no recording cameras within the vicinity and, thus, no recording of the altercation was available to view, *id.* at Bates 000015-16, 000019, 000043, as well as Plaintiff's request for copies of the correctional facility's video surveillance policy.  *Id.* at Bates 000017-18.  Wenderlich also refused Plaintiff's requests for pictures of Jolley's injuries, *id.* at 000016-17, and to

---

[14] References to "Hearing Tr." are to the Bates stamped page of a copy of the disciplinary hearing transcript filed as Wenderlich Exh. B (Doc. No. 115-2).

call as a witness the Inspector General who had received on October 22, 2008 the anonymous threat toward Plaintiff, and to present evidence regarding the threat. Wenderlich called as a witness Sgt. Smith who testified consistent with the Misbehavior Report that Plaintiff entered Jolley's cell where Plaintiff instigated the altercation with Jolley and no other inmates were involved, *id.* at Bates 000036-40, but also admitted he was unsure whether the can lid weapon was Plaintiff's or Jolley's. *Id.* at Bates 000040-41. The disciplinary hearing was continued on December 3, 2008, when Wenderlich called as a witness DOCCS Corrections Officer Zolkosky whose testimony corroborated Smith's testimony, *i.e.*, describing Plaintiff as entering Jolley's cell and instigating a physical altercation with Jolley resulting in injuries to both Plaintiff and Jolley. *Id.* at Bates 000046-48. Plaintiff then called Jolley as a witness, but Jolley refused to testify at the disciplinary hearing. *Id.* at Bates 000055, 000057-58. On December 3, 2008, at the conclusion of the disciplinary hearing, Wenderlich found Plaintiff guilty of the violent conduct, fighting, and refusing a direct order charges, but not guilty of the weapon possession charge. Plaintiff was sentenced to 18 months in SHU, and loss of 18 months of packages, commissary, and phone privileges, and 18 months loss of good time was recommended. Plaintiff subsequently filed three administrative appeals of the penalty on December 7 and December 9, 2008 and January 1, 2009, but Plaintiff's conviction on the prison disciplinary charges was upheld by Defendant SHU/Disciplinary Director Norman Bezio ("Bezio") on January 20, 2009.

Since the November 17, 2008 altercation, Plaintiff had been confined to Elmira's SHU, where Plaintiff experienced chest pains, breathing problems, and shoulder pain which Plaintiff attributes to DOCCS procedures requiring inmates in SHU be handcuffed

through the cell door prior to being removed from the SHU cell.  On December 22, 2008, Plaintiff was transferred from Elmira to Southport Correctional Facility where he was placed in SHU.  Upon Plaintiff's arrival at Southport, Plaintiff's Ambulatory Health Record ("AHR"),[15] was reviewed by Southport's medical staff who noted Plaintiff's chronic medical problems included asthma, possible hypertension and glaucoma, Plaintiff's medications included Ramipril, 5 mg per day for blood pressure control, and Albuterol as needed for asthma, Plaintiff was awaiting an ophthalmological consult to address eye pressure complaints, and Plaintiff was to receive a diet low in fat and cholesterol, but a vitamin E lotion was discontinued.  AHR at Bates 000134.

Plaintiff maintains that while housed in Southport's SHU, his cell was illuminated 24 hours a day, interfering with Plaintiff's ability to sleep, causing Plaintiff to be fatigued and to suffer from nausea, burning eyes, and an inability to exercise, yet multiple grievances Plaintiff filed regarding the constant cell illumination were ignored.  Plaintiff further alleges that while housed at Southport he was denied adequate winter clothing causing Plaintiff to experience pain in his hands and feet, and hindering his ability to exercise outside, and was also denied requests for medical care including a screening to assess the condition of Plaintiff's arteries in light of his hypertension diagnosis, hypertension treatment, and relief for his hand and foot pain, and for eczema.

During sick call on December 23, 2008, Plaintiff was seen by Nurse Gorg and requested Albuterol, daily showers and vitamin E in both a topical lotion and pill form for both eczema and a scar on his face.  *Id.* at 000133.  Because no scaling, vesicles (scaly

---

[15] Although Dr. Canfield's Declaration indicates that portions of Plaintiff's AHR are attached as exhibit A, no exhibit A to Dr. Canfield's Declaration has been electronically filed; rather portions of Plaintiff's AHR were delivered to the court on December 11, 2014, for *in camera* review.  Such records will be preserved under seal for further review as Court Exhibit A.

patches), rash, or eczema were observed, and Plaintiff's scar on his face was noted to be well-healed, Plaintiff's vitamin E request was denied. *Id.* Nurse Gorg also noted Plaintiff had no need for a "front cuff order" or "FCO." *Id.* Plaintiff was again seen by Nurse Gorg on December 24, 2008 in connection with a request for a FCO which was denied according to the order of a physician's assistant ("PA"). *Id.* By letter to the "Nurse Administrator" dated January 10, 2009, Plaintiff explained that he had been diagnosed as a child with "eczema," and in 2006 with "dermatitis," but that the two terms are used interchangeably to refer to a skin disorder involving a red, itchy rash. *Id.* at Bates 000124. In a Sick Call Response dated January 13, 2009, Southport Nurse Administrator advised Plaintiff he was being denied treatment for a skin condition because Plaintiff had "been unable to document a skin problem requiring treatment. . . ." *Id.* at Bates 000123.[16]

On January 12, 2009, Plaintiff complained of an inability to sleep and requested a sleep aid, but Plaintiff was advised that his inability to sleep was a mental health issue and Plaintiff was referred for a mental health assessment. AHR at 000127. On January 15, 2009, Plaintiff was told to use moisturizer from the commissary to treat some "slightly dry areas" on his right and left forearms. *Id.* at Bates 000121. On February 5, 2009, Plaintiff was instructed to continue to use Lubriderm. *Id.* at Bates 000119. On February 26, 2009, Plaintiff was seen in Southport's sick call for complaints of pressure in his eyes, for which Plaintiff was scheduled for an ophthalmology consultation to rule out glaucoma. *Id.* at Bates 000118.

---

[16] In another Sick Call Response on which the date is illegible, Plaintiff was advised by the P.A. that Plaintiff "may buy commissary moisturizer if needed." AHR at Bates 000122.

On April 17, 2009, Plaintiff requested a "low sodium high fiber diet" so that he could discontinue medication for his high blood pressure, AHR at Bates 000114, which was 107/73 on April 27, 2009.  *Id.*  Plaintiff was seen by Nurse Practitioner Henry Fowler ("N.P. Fowler")[17] on June 22, 2009 for complaints of mid-sternal pain at night. *Id.* at Bates 000113.  Upon examination, Plaintiff's weight was 246, and blood pressure was elevated at 153/81, but no bruits (whooshing sound indicative of change or reduced blood flow caused by plaque buildup in carotid artery),[18] were detected in his carotid artery, his thyroid was within normal limits, heart rate and rhythm were normal and lungs were clear.  *Id.*  N.P. Fowler reviewed with Plaintiff his laboratory reports, discussed Plaintiff's treatment options, ordered additional laboratory tests, prescribed Zantac, and encouraged Plaintiff to continue taking Ramipril for hypertension.  *Id.*

Plaintiff was examined on August 3, 2009, by Defendant Wesley Canfield, M.D. ("Dr. Canfield"), who reviewed Plaintiff's latest laboratory tests which showed Plaintiff's cholesterol was normal at 187, with slightly high LDL of 122.  AHR at Bates 000111.  Dr. Canfield also reviewed an EKG done in April 2009 which was within normal limits. Upon examination, Plaintiff's weight was 235, a 21-lb. weight gain since 2005, blood pressure was elevated at 149/87, and Plaintiff's right ear canal was inflamed, but Plaintiff made no cardiac complaints warranting further investigation at that time.  *Id.*

Plaintiff, since being transferred to Southport on December 22, 2008, had not been subjected to any urinalysis, random or otherwise, at least until he completed his disciplinary sentence in Southport's SHU, subsequent to which Plaintiff was transferred

---

[17] Although Plaintiff refers to this Defendant as "Doctor Henry Fowler," the record indicates that Fowler is a Nurse Practitioner.  *See* Dr. Canfield Declaration ¶ 10.
[18] *See* What Are the Signs and Symptoms of Carotid Artery Disease?, *available at* https://www.nhlbi.nih.gov/health/health-topics/catd/signs, last visited Jan. 21, 2016.

to Sing Sing Correctional Facility ("Sing Sing"), where, on February 3, 2011, two days

after the denial of Defendants' motion to dismiss the instant action, Plaintiff was

selected for a random urinalysis.  Amended Complaint ¶¶ 107-107(b).  Plaintiff was

unable to urinate during the three-hours allotted for urinalysis pursuant to Directive

4937.  *Id.* ¶¶ 107(c)-(d).   Plaintiff then filed a grievance regarding the urinalysis ("Third

Grievance").  Because the Third Grievance was never answered, Plaintiff wrote letters

to the Sing Sing inmate grievance committee which were ignored, and to Defendants

Sing Sing Superintendent Heath and DOCCS Commissioner Fischer.  Heath's response

was that there was no record of the Third Grievance.  By letter dated June 14, 2011,

Defendant DOCCS Inmate Grievance Director Karen Bellamy ("Bellamy"), advised

Plaintiff that a grievance is to be directed to the correctional facility where the related

incident occurred.  Neither Fischer nor Bellamy, however, addressed Plaintiff's assertion

of interference with his Third Grievance.


## **DISCUSSION**

### 1.     **Summary Judgment**

Summary judgment of a claim or defense will be granted when a moving party

demonstrates that there are no genuine issues as to any material fact and that a moving

party is entitled to judgment as a matter of law.  Fed. Civ. P. 56(a) and (b); *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 250-51 (1986); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir.

2003).  The court is required to construe the evidence in the light most favorable to the

non-moving party.  *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The party

moving for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact and if there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, a moving party cannot obtain a summary judgment.  *Celotex*, 477 U.S. at 322; *see Anderson*, 477 U.S. at 247-48 ("summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  "A fact is material if it 'might affect the outcome of the suit under governing law.'"  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248).

"[T]he evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988)).  A defendant is entitled to summary judgment where "'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on'" an essential element of a claim on which the plaintiff bears the burden of proof.  *In re Omnicom Group, Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (quoting *Burke v. Jacoby*, 981 F.2d 1372, 1379 (2d Cir. 1992)).  Once a party moving for summary judgment has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor.  *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995).  "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine'

issues for trial." *Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

Plaintiff's claims seek damages for alleged violations of his constitutional rights pursuant to 42 U.S.C. § 1983 ("§ 1983"), which imposes civil liability upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws of the United States. Section 1983, however, does not itself provide a source of substantive rights, but instead provides the mechanism by which a plaintiff may seek vindication of federal rights conferred elsewhere. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989). Here, Plaintiff claims violations of his First, Fourth, Eighth and Fourteenth Amendment rights. Plaintiff's claims are based on Defendants' repeatedly subjecting Plaintiff to urinalyses unsupported by any suspicion other than that supplied by unidentified confidential informants whose reliability Plaintiff maintains was never established, Defendants' alleged failure to provide Plaintiff with appropriate medical treatment for his hypertension and eczema, and a denial of due process at the disciplinary hearing held on the Misbehavior Report. Plaintiff also asserts a claim for conspiracy in violation of 42 U.S.C. § 1985.

Preliminarily, the court addresses Defendants' assertion that Plaintiff's failure to to submit a counter statement to Defendants' Statement of Facts requires each of the facts therein asserted by deemed admitted. Defendants' Reply at 2 (citing Local Rules of Civil Procedure – W.D.N.Y., Rule 56(a)(2)). As relevant, Fed.R.Civ.P. 83 provides that a "local rule imposing a requirement of form must not be enforced in a way that cause a party to lose any right because of a nonwillful failure to comply." Fed.R.Civ.P.

83(a)(2).  *See Buck v. Cleary*, 345 Fed.Appx. 660, 662 (2d. Cir. Sept. 14, 2009) (finding district court abused discretion in deeming admitted defendants' statement of material facts based on plaintiff's failure to separately respond to each stated fact as required under the applicable local rule, vacating in the absence of any evidence that the failure to comply was willful, and remanding that portion of judgment based on such deemed admitted facts).  Similarly, in the instant case, nothing in the record establishes that Plaintiff's failure to formally comply with Local Rule 56 was willful.  Accordingly, the court, in the exercise of its discretion, does not deem admitted the facts set forth in Defendants' Statement of Facts.

## 2.    Urinalyses Challenges

Plaintiff raises several challenges to the six urinalyses that ostensibly were based on probable cause ("non-random urinalyses"), and the two random and suspicionless urinalyses ("random urinalyses").  Plaintiff particularly alleges supervisory liability against Defendants Fischer and LeClaire based on the six non-random urinalyses in violation of the Fourth, Eighth, and Fourteenth Amendments, Amended Complaint, First Cause of Action, that Defendant Smith and "unknown Lieutenants or higher-ranking authority" who approved the non-random urinalyses failed to test the reliability of the confidential sources prior to conducting the non-random urinalyses of Plaintiff in violation of the Fourth, Eighth and Fourteenth Amendments, *id.*, Second and Third Causes of Action, Defendant Inmate Records Coordinator/Records Access Officer Mary Batroney ("Batroney"), interfered with Plaintiff's First Amendment Right to petition the government for redress of grievances by denying Plaintiff access to records containing the identity of the confidential informants who made the statements supporting the non-

18

random urinalyses, and Defendants Heath, Bellamy, and Fischer are liable for failing to correct Batroney's actions, *id.*, Fourth Cause of Action, and Defendants CORC Director Ludquist ("Ludquist"), Smith, Zigenfris, Wenderlich, Superintendent Mark Bradt ("Bradt"), and LeClaire subjected Plaintiff to unreasonable urinalyses and failed to take any action to cease such actions, in violation of the First, Fourth, Eighth and Fourteenth Amendments, *id.*, Fifth Cause of Action.  Defendants argue in support of summary judgment that Defendants are entitled to qualified immunity of Plaintiff's claims that the non-random urinalyses violated the Fourth Amendment's prohibition against unreasonable searches and seizures asserting Defendants' research has failed to reveal any definitive legal authority that a suspicionless urinalysis of an inmate constitutes a Fourth Amendment violation.  Defendants' Memorandum at 5-7.[19]  In opposition to summary judgment, Plaintiff asserts that requiring a "reasonable suspicion" of drug use before ordering a urinalysis for a specific individual was clearly established prior to the 2007 and 2008 urinalyses Plaintiff challenges in this action. Plaintiff's Memorandum at 3-6 (quoting *Strauch v. Coughlin*, 1993 WL 88154, at * 4 (S.D.N.Y. Mar. 24, 1993)).  In further support of summary judgment, Defendants argue Plaintiff has misconstrued the relevant caselaw, asserting at least one District Court within the Second Circuit has granted a prison official qualified immunity for a non-random urinalysis that was not supported by reasonable suspicion.  Defendants' Reply at 2-3 (citing *Strauch v. Demski*, 892 F.Supp. 503, 505 (S.D.N.Y. 1995).

---

[19] Defendants make no argument in support of summary judgment with regard to Plaintiff's § 1983 claims based on the two random urinalyses.

## A.    Qualified Immunity

Qualified immunity shields law enforcement officials who perform discretionary functions from liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable prison official would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982); *Washington Square Post No. 1212 v. Maduro*, 907 F.2d 1288, 1291 (2d Cir. 1990).  "To determine whether a right was clearly established, we consider 'whether the right in question was defined with reasonable specificity,' 'whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question,' and 'whether under preexisting law a reasonable defendant officer would have understood that his or her acts were unlawful.'"  *Barnes v. Furman*, __ Fed.Appx. __, 2015 WL 6216534, at * 3, (2d Cir. Oct. 22, 2015) (quoting *Dean v. Blumental*, 577 F.3d 60, 68 (2d Cir. 2009)).  Even if the right at issue were clearly established, if it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may nevertheless be entitled to qualified immunity.  *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001); *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 568-69 (2d Cir. 1996).  "The availability of the defense depends on whether a reasonable officer could have believed his action to be lawful, in light of clearly established law and the information he possessed."  *Weyant v. Okst*, 101 F.3d 845, 858 (2d Cir. 1996) (internal quotation marks and citation omitted).  Where, however, the objective reasonableness of an officer's actions depends on disputed facts, summary judgment based on qualified immunity is properly denied.  *Rivera v. United States*, 928 F.2d 592, 607 (2d Cir. 1991).

Significantly, "[w]hen officials follow an established prison policy, as defendants did here, their entitlement to qualified immunity depends on 'whether a reasonable officer might have believed that the challenged order was lawful in light of legitimate penological interests supporting' the directive." *Barnes v. Furman*, ___ Fed. Appx. ___, 2015 WL 6216534, at *4 (2d Cir. Oct. 22, 2015) (denying summary judgment based on qualified immunity to defendant DOCCS officials who confiscated from the inmate plaintiff, whose registered religious belief was Jewish, a religious head covering that relevant prison regulations permitted to be worn only by prisoners whose registered religious belief was Rastafarian because a genuine issue of material fact existed as to whether there was a legitimate penological reason to limit the head covering only to prisoners registered as Rastafarian).

It is settled that urinalysis constitutes a search subject to the Fourth Amendment. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 614 (1989) (holding breath and urine tests of railroad employees required by private railroads acting pursuant to federal regulations implicates Fourth Amendment concerns); *Harris v. Keane*, 962 F.Supp. 397, 407 (S.D.N.Y. 1997) (observing non-consensual urinalysis constitutes a search under the Fourth Amendment).  It is also well-established that a prisoner's right to be free from unreasonable searches is diminished once he enters a correctional facility.  *Skinner*, 489 U.S. at 619-20; *Bell v. Wolfish*, 441 U.S. 520, 557 (1979)).  Nevertheless, urinalyses performed for drug testing constitutes an illegal search when it is undertaken to harass an inmate.  *Harris*, 962 F.Supp. at 407; *Rodriguez v. Coughlin*, 795 F.Supp. 609, (W.D.N.Y. 1992).   Further, "when correctional staff receives information from a source that the inmate is currently under the influence of or has

recently used illicit drugs or alcohol," N.Y. Comp.Codes R. & Regs. tit. 7, § 1020.4(a)(4) ("DOCCS Reg. § 1020.4(a)(4)"), there is reasonable cause supporting urinalysis. *McFadden v. Roy*, 2009 WL 799968, at *14, n. 18 (N.D.N.Y. Mar. 25, 2009).

The Supreme Court has held that a urinalysis constitutes a search with the meaning of the Fourth Amendment, *Skinner*, 489 U.S. at 614, but to date, neither the Supreme Court nor the Second Circuit has held that non-random urinalyses of inmates not based on reasonable suspicion are unreasonable under the Fourth Amendment. *See Strauch v. Demskie*, 892 F.Supp. 503, 506 n. 6 (S.D.N.Y. 1995) (noting that as of 1995, whether a suspicionless, non-random urinalyses of inmate violated the Fourth Amendment was undecided). Nevertheless, although inmates' Fourth Amendment rights are necessarily restricted by concerns of prison security and safety, prison inmates retain "some, albeit limited, protection from urinalyses conducted in an unreasonable manner. . . ." *Storms v. Coughlin*, 600 F.Supp. 1214, 1224 (S.D.N.Y. 1984).

In *Storms*, the inmate plaintiff challenged the state prison officials' practice of daily unrinalyses conducted on inmates ostensibly randomly selected. *Id.* at 1216-17. The specific manner in which inmates were selected for the daily random urinalyses included the prison's watch commander, upon request by the prison official who processes urinalyses, selecting cards from a board holding a group of cards with the name of an inmate listed on each card. *Id.* at 1216. Each inmate whose card is picked from the board is ordered to report for urinalysis. *Id.* The court granted a preliminary injunction enjoining the defendant prison officials' procedure for randomly selecting the inmates to be subjected to urinalyses. *Id.* at 1216 (commenting that the defendants

were, at the time, designing a computer program to "select prisoners on a truly random basis"). The court also compared the inmate plaintiff's challenge to the random urinalyses testing procedure to the mandatory body cavity searches each inmate is required to undergo after every "contact" visit with outsiders. *Id.* at 1219 (citing *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)). Observing that the Supreme Court held that the visual body cavity searches, despite invading the personal privacy of inmates and being based on less than probable cause, were permissible when balanced against "the significant and legitimate security interests of the institution . . . ," *id.* (quoting *Bell*, 441 U.S. at 560), the court took "judicial notice that drug use among prisoners is a serious, disruptive problem within American prisons," and deferred to the defendant New York prison authorities' use of random urinalyses provided such searches were conducted "in a reasonable manner," and upheld the random urinalyses challenged under the Fourth Amendment. *Id.* at 1211. Although Plaintiff maintains *Storms* does not permit urinalysis absent reasonable suspicion, Plaintiff's Memorandum at 4-5 (citing *Storms*, 600 F.Supp. at 1224), a plain reading of *Storms* establishes that the court took issue only with the manner in which the purported random urinalyses were conducted, specifically, that the method employed by the defendant corrections officials to select the inmates to be tested was subject to potential abuse and harassment – whether conscious or unconscious – by the prison's watch commander who made the selections. *Storms*, 600 F.Supp. at 1216, 1224.

Further, in the instant case, the suspicion-based urinalyses to which Plaintiff was subjected were undertaken by Defendants pursuant to Directive 4937, which is essentially a restatement of DOCCS Reg. § 1020.4(a)(4), providing that "[u]rinalysis

testing of inmates shall be conducted . . . when correctional staff receives information

from a source that the inmate is currently under the influence of or has recently used

illicit drugs or alcohol."  It is significant that the plain language DOCCS Reg. §

1020.4(a)(4) does not require that the "source" from whom the correctional staff

receives the information that the inmate is or has used drugs be reliable.  Absent such

stated requirement, Plaintiff's argument that the reliability of the confidential informants

can be determined only by the urinalyses results is moot.  Moreover, it cannot be

questioned that in conducting the challenged urinalyses, including both suspicion-based

and random, Defendants were acting pursuant to the prison policy, Directive 4937,

established by DOCCS Reg. § 1020.4, which was promulgated in furtherance of

DOCCS "legitimate penological interests in maintaining prison security and discipline,

particularly concerning the suspected smuggling and possession of illegal drugs. . . ,"

and which outweigh any privacy rights retained by Plaintiff under the facts of this case.

*Sital v. Burgio*, 592 F.Supp.2d 355, 359 (W.D.N.Y. 2009) (citing cases).  *See Varrone v.*

*Bilotti*, 123 F.3d 75, 81 (2d Cir. 1997) (considering the problems and realities that face

prison officers, including dealing with drugs in those institutions, and the deference and

discretion given those officers' day-to-day decisions relating to prison safety, security,

and discipline" in holding prison officers were entitled to qualified immunity on inmate

plaintiff's Fourth Amendment claim challenging strip search of inmate's prison visitors).

There are thus no issues of fact which could support a finding that Defendants' actions

in submitting Plaintiff to the challenged urinalyses violated any clearly established rights

of which Defendants should have been aware such that Defendants are entitled to

qualified immunity on this claim.

Accordingly, summary judgment should be GRANTED insofar as Defendants assert they are entitled to qualified immunity on Plaintiff's § 1983 claims based on the non-random urinalyses.

### B.    Due Process

Insofar as Plaintiff challenges the procedures by which he was selected for the suspicion-based urinalyses violate due process given that Defendants have admitted the reliability of an inmate's assertion that another inmate has or is using drugs can be determined based only on the urinalyses results, Amended Complaint ¶¶ 5, 7, and First Cause of Action, because none of the urinalyses Plaintiff challenges in this action yielded positive results, Plaintiff cannot establish the requisite deprivation of a protected liberty interest to support such claim. *See Sandin v. Conner*, 515 US. 472, 483-84 (1995) (holding to assert a due process claim, an inmate must show he has been deprived of a protected liberty interest).  In particular, because none of the urinalyses yielded positive results, Plaintiff was never subjected to any discipline in connection with the urinalyses such that Plaintiff's due process claim is based not on Defendants' violation of Plaintiff's protected liberty interest but, rather, on mere speculation that a false positive result could wrongly subject Plaintiff to a deprivation of a protected liberty interest.  *See Storms*, 600 F.Supp. at 1225-26 (declining to consider inmate plaintiff's due process challenge to random urinalyses selection procedures where inmate plaintiff successfully challenged sole positive urinalysis results and, thus, was not disciplined). Summary judgment must thus be GRANTED as to Plaintiff's Fourteenth Amendment due process challenge to the urinalyses procedures.

3.       **Retaliation Claim**

Plaintiff alleges that the repeated urinalyses to which he was subjected to by

Defendants was intended as retaliation against Plaintiff for filing grievances regarding

the urinalyses.  Amended Complaint, Fourth Cause of Action ¶ 2.  Defendants argue in

support of summary judgment that Plaintiff cannot establish the requisite causal

connection between Plaintiff's protected activity and the urinalyses.  Defendants'

Memorandum at 10-12.  In opposition to summary judgment, Plaintiff maintains he was

subjected to a "continuous combination of retaliatory acts" that sufficiently establishes

the causal connection requirement of his First Amendment retaliation claim.  Plaintiff's

Memorandum at 10-14.  Defendants do not argue in further support of summary

judgment on this claim.

Although prison officials may not retaliate against prisoners for exercising their

constitutional rights, *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (holding inmate

plaintiff's allegation that he sought relief in the courts on two occasions causing

defendant prison officials to retaliate against him brought claim within purview of § 1983,

and citing *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988)), retaliation claims typically

are viewed with skepticism because "prisoners can claim retaliation for every decision

they dislike*." Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citing *Flaherty v.

Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).  Accordingly, "[a] complaint of retaliation that

is 'wholly conclusory' can be dismissed on the pleadings alone.'" *Id.*

"To establish a prima facie case of First Amendment retaliation, a plaintiff must

establish '(1) that the speech or conduct at issue was protected, (2) that the defendant

took adverse action against the plaintiff, and (3) that there was a causal connection

between the protected speech and the adverse action.'"  *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) (quoting *Morales v. Mackalm*, 278 F.3d 126, 131 (2d Cir. 2002) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001))).  "Regardless of the presence of retaliatory motive, however, a defendant may be entitled to summary judgment if he can show dual motivation, *i.e.*, that even without the improper motivation the alleged retaliatory action would have occurred."  *Id.* at 287-88 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).  The initial burden is on the plaintiff to demonstrate an improper motive played part in the defendants' action, after which the burden shifts to the defendants to show the same action would have been taken absent any improper motive.  *Id.* at 288.

In the instant case, it is undisputed that Plaintiff's filing of grievances and complaints challenging Defendants' actions in repeatedly subjecting Plaintiff to urinalysis constitutes protected activity under the First Amendment.  *Davis v. Goord*, 320 F.3d 346, 352-53 (2d Cir. 2003) ("the filing of prison grievances is a constitutionally protected activity").  The first element for a prima facie retaliation claim is thus satisfied.

With regard to the second element for a *prima facie* retaliation claim, in the context of a First Amendment retaliation claim, an "adverse action" is "conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights."  *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (quotation omitted).  In the prison context, "this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits."  *Id.*  "Otherwise the retaliatory act is simply *de minimus* and therefore outside the ambit of constitutional protection."  *Davis*, 320 F.3d at 352

(quotation omitted).  Insofar as urinalysis "involves both embarrassment and potential punishment," *Storms*, 600 F.Supp. at 1223, being required to submit to a urinalysis constitutes an adverse action.  *Compare Davis*, 320 F.3d at 353 (holding failing to provide inmate plaintiff with high fiber diet and requiring inmate plaintiff to wait for three hours for a medical appointment could constitute adverse actions supporting First Amendment retaliation claim).  There is thus an issue of fact as to whether the urinalyses to which Plaintiff was subjected constituted adverse actions, but as discussed below, such question of fact is not dispositive.

To satisfy the causation requirement, Plaintiff must make sufficient allegations "to support the inference that the speech played a substantial part in the adverse action." *Davis*, 320 F.3d at 354 (quotation omitted).  Significantly, the causative element may be established by circumstantial evidence, including temporal proximity between the protected activity and the adverse action.  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).  Specifically, a short time frame between the filing of a grievance and the alleged retaliatory action, and the continued alleged retaliatory conduct can support the requisite inference of a causal connection.  *Davis*, 320 F.3d at 354 (citing *Morales v. Mackalm*, 278 F.3d 126, 131 (2d Cir. 2002), *abrogated on other grounds by Porter v. Nussle*, 534 U.S. 516, 532 (2002), *as recognized in Berry v. Kerik*, 366 F.3d 85, 87-88 (2d Cir. 2003)).  Evidence of prior good behavior may also be circumstantial evidence of retaliation.  *Colon*, 58 F.3d at 872 (citing *Flaherty*, 713 F.2d at 13).  Here, the undisputed facts establish that the alleged retaliatory actions of which Plaintiff complains largely occurred shortly after Plaintiff engaged in protected activity, including, for example, that on July 27, 2008, less than 72 hours of the CORC's decision on the

First Grievance, Plaintiff was ostensibly randomly selected for urinalysis, and was tested along with known drug abusers, Amended Complaint ¶¶ 12-13, 20, is circumstantial evidence of retaliation.  *Davis*, 320 F.3d at 354.  Further, that none of Plaintiff's urinalyses yielded a positive result is evidence of prior good behavior which may be circumstantial evidence of retaliation.  *Colon*, 58 F.3d at 872.

The presence in the record of genuine issues of material facts as to whether Plaintiff was subjected to adverse action triggered by his filing of inmate grievances so as to establish a *prima facie* First Amendment retaliation claim.  Nevertheless, even assuming, arguendo, that a reasonable jury would, upon trial, construe the genuine issues of material fact to support a *prima facie* retaliation claim thus shifting the burden to Defendants, the record establishes that "even without the improper motivation the alleged retaliatory action would have occurred."  *Scott*, 344 F.3d at 287-88.  Specifically, not only were both the non-random urinalyses and the random urinalyses conducted pursuant to Directive 4937, with the non-random urinalyses conducted upon receiving information from an unidentified informant that Plaintiff was using illegal drugs, and the random urinalyses conducted upon being randomly selected by a computer program, but nothing within Directive 4937 permits any DOCCS official, including those sued as Defendants in this action, any discretion to dispense with conducting a test of Plaintiff's urine once he was selected, even if the DOCCS officials doubted the informant's statement or had reason to doubt the random selection process.  As such, the record establishes Plaintiff would have been required to submit to the challenged urinalyses even without the alleged improper motivation.  *See Scott*, 344 F.3d at 288.

Summary judgment on Plaintiff's retaliation claim therefore should be GRANTED.

## 4.     Due Process Claim

In his Seventh Cause of Action, Plaintiff claims Defendants Wenderlich and Bezio deprived him of Fourteenth Amendment due process in connection with the Tier III disciplinary hearing held on the First Misbehavior Report by denying Plaintiff (1) any audio and video recordings of the November 17, 2008 altercation involving inmate Jolley; (2) copies of DOCCS's policies regarding the retention of audio and video recordings; (3) testimony from the DOCCS inspector who investigated the death threats against Plaintiff as well as documentation of such threats, (4) photographs of the injuries sustained by Jolley, the other inmate with whom Plaintiff was allegedly fighting; and (5) a copy of the inmate witness refusal form signed by Jolley in refusing to testify for Plaintiff at the disciplinary hearing.  Amended Complaint, ¶¶ 38-46 and Seventh Cause of Action.  Plaintiff also maintains that Defendant Smith, who authored the Misbehavior Report, materially misrepresented to Wenderlich that Plaintiff had been targeted by other inmates as a "snitch" despite the fact that Plaintiff made numerous complaints to Smith about being repeatedly subjected to urinalyses based on false statements by confidential informants, and that Wenderlich refused to consider the numerous, bogus confidential informants' statements according to which Plaintiff was required to submit to the non-random urinalyses.  *Id.* ¶ 39-41.   Defendants argue in support of summary judgment on this claim that Plaintiff was provided all process he was due under the Fourteenth Amendment, and that the evidence Plaintiff was denied either does not exist or was irrelevant to the determination of the charges pending against Plaintiff at the

disciplinary hearing.  Defendants' Memorandum at 14.  In opposition to summary

judgment, Plaintiff argues there exist material issues of disputed facts as to whether

Defendant Wenderlich's denial of Plaintiff's request for testimony and documents from

the inspector general who received information of the death threats against Plaintiff

were justified given that such information was directly relevant to Plaintiff's defense that

his involvement in the altercation was solely in self-defense, and the Investigative

Report would have established that a confidential informant fabricated allegations that

Plaintiff was extorting other inmates and that physical threats had been made against

Plaintiff three weeks prior to the altercation.  Plaintiff's Memorandum at 16-17.

Defendants do not argue in further support of summary judgment on this claim.[20]

  "Prison disciplinary proceedings are not part of a criminal prosecution, and the

full panoply of rights due a defendant in such proceedings does not apply."  *Wolff v.*

*McDonnell*, 418 U.S. 539, 556 (1974).  "[R]egardless of state procedural guarantees,

the only process due an inmate is that minimal process guaranteed by the Constitution

as outlined in *Wolff*."  *Shakur v. Selsky*, 391 F.3d 106, 119 (2d Cir. 2004).  As such, a

violation of a state prison regulation during a prison disciplinary hearing does not give

rise to a § 1983 due process claim.  *Blouin v. Spitzer*, 356 F.3d 348, 363 (2d Cir. 2004)

("federal law, not state regulations, determines the procedures necessary to protect that

liberty interest.").  Prison inmates nevertheless are "entitled to certain procedural

protections when disciplinary actions subject them to further liberty deprivations such as

. . . special confinement that imposes an atypical hardship."  *Sira v. Morton*, 380 F.3d

---

[20] The parties do not dispute that the prison discipline – 18 months in SHU with loss of privileges and good time – imposed following the guilty disposition constituted a deprivation of a protected liberty interest, a prerequisite to a viable Fourteenth Amendment due process claim.  *Sandin v. Connor*, 515 U.S. 472, 484 (1995) (holding Fourteenth Amendment due process violation requires inmate establish he was deprived of a protected liberty interest without sufficient process).

57, 69 (2d Cir. 2004).  In particular, "an inmate is entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary action taken."  *Sira*, 380 F.3d at 69.

In the instant case, the court construes as a challenge to Wenderlich's impartiality that Wenderlich, who presided over the disciplinary hearing, was wrongly misled by Smith regarding other inmates' targeting Plaintiff as a "snitch" despite Plaintiff's repeated complaints to Smith that the non-random urinalyses were based on false statements by confidential informants and that Wenderlich staunchly refused to consider the numerous, bogus confidential informants' statements proffered in support of the non-random urinalyses.  It is "well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts," and "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally."  *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996).  Further, the due process impartiality standard is satisfied if "some evidence" in the record supports the decision of the prison disciplinary proceeding.  *Superintendent v. Hill*, 472 U.S. 445, 455-56 (1985).

Here, the disciplinary hearing evidence included information regarding Jolley's injuries, establishing Jolley sustained numerous lacerations, some of which were deep, which Wenderlich considered but refused to share with Plaintiff, Hearing Tr. at Bates 000026-28, pictures of the bloodied, folded over can lid which was used as a weapon during the altercation, *id*. at Bates 000029, and testimony from Defendant Smith, the

Misbehavior Report's author, who testified that he observed Plaintiff enter Jolley's cell where Plaintiff engaged in an altercation with Jolley that later spilled out of Jolley's cell and into the gallery. *Id.* at Bates 000036-39. Smith denied any doubt that Plaintiff was fighting with Jolley. *Id.* at Bates 000040. Following the altercation, a weapon was recovered from Jolley's cell. *Id.* Also testifying at the disciplinary hearing was Corrections Officer Zolkosky ("Zolkosky"), whose testimony corroborated Smith's testimony, *i.e.*, describing Plaintiff as entering Jolley's cell and instigating a physical altercation with Jolley resulting in injuries to both Plaintiff and Jolley. *Id.* at Bates 000040-48. Although Plaintiff called Jolley as a witness, Jolley refused to testify at the disciplinary hearing. *Id.* at Bates 000055, 000057-58. There thus is, even without Jolley's testimony and the other evidence sought by Plaintiff by denied by Wenderlich, some evidence supporting Wenderlich's determination that Plaintiff was guilty on the disciplinary charges of fighting, violent conduct, and refusing to obey a direct order.

Moreover, despite pleading not guilty to each of the disciplinary charges in the Misbehavior Report, Plaintiff has not denied being involved in the November 17, 2008 altercation; rather, Plaintiff's due process challenge to the disciplinary hearing is limited to asserting that he did not provoke the altercation but acted only in self-defense, that he was not in possession of any weapon, and that Jolley was not the other inmate involved in the altercation. Such assertions by Plaintiff, even if true, do not undermine Wenderlich's determination that Plaintiff was guilty of three of the four charged prison disciplinary rule infractions. Furthermore, Smith's denial of any knowledge of "snitch notes" written about Plaintiff by other inmates, or of death threats against Plaintiff, *id.* at

Bates 000039, even if incorrectly recalled by Smith, is irrelevant to whether Plaintiff was involved in the November 17, 2008 altercation.

Although Plaintiff maintains he was denied due process at the disciplinary hearing when Defendants failed to provide Plaintiff with a copy of any audio or video recordings of the November 17, 2008 altercation, including video of the C-Block gallery and mess halls and of the SHU block, as well as Elmira's policy for maintaining and recycling such recordings, Defendants, in support of summary judgment, have submitted a statement from Wenderlich explaining that there is no recording video camera located at the C-Block gallery where the incident occurred.  Wenderlich Declaration ¶ 5.  Although Wenderlich could not recall whether there were recording cameras located in the C-Block mess halls and the SHU block at the time of the altercation, Wenderlich explains that even if there were, any such video from such recordings would be irrelevant to the disciplinary charges with which Plaintiff was faced at the disciplinary hearing because the altercation did not occur in the C-Block mess halls or the SHU block.  *Id.* ¶ 6.  As for Plaintiff's request for the DOCCS Directive pertaining to the retention and storage of video, Wenderlich maintains that such policy is also irrelevant because no relevant video of the altercation ever existed, such that there can be no failure to preserve based on a DOCCS directive.  *Id.* at 3, ¶ 1.[21]  Similarly, Wenderlich explains that the photographs of the injuries sustained in the altercation by Jolley, the inmate with whom Plaintiff was charged with fighting, are irrelevant to whether Plaintiff was involved in the altercation.  *Id.* ¶ 7.

---

[21] The court notes that two separate paragraphs in Wenderlich's Declaration are denominated as "1" and, in the interest of clarity, includes the page number on which the ¶ 1 to which the court cites is located.

Although Wenderlich denied Plaintiff's request to call as a witness the inspector general who Plaintiff maintains received the death threats made toward Plaintiff, Hearing Tr. at Bates 000053, it is unclear how such testimony would have assisted Plaintiff in avoiding being found guilty of fighting, violent conduct, and refusing a direct order; instead, the Hearing Transcript establishes Plaintiff sought the inspector general's testimony only to corroborate Plaintiff's assertion that his involvement in the altercation was limited to self-defense.  *Id.*   Furthermore, the record establishes that Plaintiff was permitted to call Jolley as a witness, *id*. at Bates 000054-55, but that Jolley declined to testify.  *Id*. at 000057-58.

The record thus is devoid of any evidence supporting Plaintiff's claim that he was denied due process in connection with the disciplinary hearing.  Defendants' motion thus should be GRANTED as to the denial of Fourteenth Amendment due process at the disciplinary hearing as alleged in Plaintiff's Seventh Cause of Action.

**5.      Eighth Amendment Claims**

Plaintiff's Eighth Cause of Action alleges Defendants Dr. Canfield, N.P. Fowler, Nurse Dyal-Weaver, and Nurse Administrator Cathy Felker ("Felker") denied Plaintiff adequate medical care in violation of the Eighth Amendment's prohibition of cruel and unusual punishment because Defendants ignored Plaintiff's complaints of chest pain and a skin condition, failed to provide Plaintiff with adequate winter clothing, and kept Plaintiff's cell illuminated 24 hours a day, interfering with Plaintiff's ability to sleep. Amended Complaint, Eighth Cause of Action.  Defendants argue in support of summary judgment that the record is devoid of any evidence establishing Defendants were deliberately indifferent to any serious medical need of Plaintiff's.  Defendants'

Memorandum at 7-10.  In opposition to summary judgment, Plaintiff asserts that triable issues of fact exist as to whether Plaintiff was deprived of adequate medical care when Defendants failed to respond to Plaintiff's complaints of chest pains, breathing problems, and shoulder pain caused by requiring Plaintiff to be handcuffed through the door to his SHU cell, and also failed to provide Plaintiff with adequate winter clothing and kept Plaintiff's cell illuminated 24 hours a day, interfering with Plaintiff's ability to sleep.  Plaintiff's Memorandum at 8-10.  In further support of summary judgment, Defendants maintain that each of the issues Plaintiff raises in opposing summary judgment has been addressed by Dr. Canfield who establishes that Defendants adequately responded to all of Plaintiff's medical complaints, and there is no evidence that any of DOCCS's medical staff were responsible for providing Plaintiff with winter clothing or the illumination of Plaintiff's cell.  Defendants' Reply at 3-5.

To prevail on an Eighth Amendment claim based on inadequate medical care or unsafe living conditions, a plaintiff must establish (1) he was incarcerated under conditions posing a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  A deliberate indifference claim has both objective and subjective elements. *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).  "Objectively, the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration or extreme pain exists."  *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (internal citation and quotation marks omitted). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions of confinement' claim."

*Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) (citing *Hudson v. McMillan*, 503

U.S. 1, 9 (1992) (only deprivations denying "the minimal civilized measures of life's

necessities" are sufficiently serious to form the basis of an Eighth Amendment violation).

"Subjectively, the official charged . . . must act with a sufficiently culpable state of mind."

*Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (citation and internal quotation marks

omitted). "Deliberate indifference" requires more than negligence, but less than conduct

undertaken for the very purpose of causing harm. *Hathaway*, 37 F.3d at 66 (citing

*Farmer*, 511 U.S. at 835). For a prison official to act with deliberate indifference, he

must both know of and disregard an excessive risk to an inmate's health or safety. *Id*.

Here, the court addresses Plaintiff's Eighth Amendment claim alleged under Plaintiff's

Eighth Cause of Action first as to the alleged deprivation of adequate medical care, and

then as to the alleged prison conditions.

### A.    Medical Care

To substantiate an Eighth Amendment claim for medical indifference, an inmate

plaintiff must prove the defendants were deliberately indifferent to a serious medical

need. *Farmer*, 511 U.S. at 834-35. Where the inmate plaintiff alleges defendants failed

to provide any treatment for a medical condition, "courts examine whether the inmate's

medical condition is sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d

Cir. 2006). "[P]rison officials and medical officers have wide discretion in treating

prisoners, and Section 1983 is not designed to permit federal courts to interfere in the

ordinary medical practices of state prisons." *Sonds v. St. Barnabas Hospital*

*Correctional Health Services*, 151 F.Supp. 303, 311 (S.D.N.Y. 2001) (citing cases). "[A]

prisoner does not have the right to choose his medical treatment as long as he receives

adequate treatment," *Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011), and a difference of opinion between an inmate and prison officials as to prescribed medical treatment does not, as a matter of law, rise to the level of a constitutional violation. *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).  Where, as here, the challenge is to the adequacy of the treatment provided, such as in cases where treatment is alleged to have been delayed, the seriousness inquiry focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, not considered in the abstract." *Smith*, 316 F.3d at 186.

In the instant case, it is without question that three of Plaintiff's alleged medical complaints, *i.e.*, hypertension, chest pain, and eye pressure, were sufficiently serious in that, left untreated, they could result in degeneration and extreme pain or even death. The same cannot be said for Plaintiff's complaints of some skin irritation which was adequately treated with over-the-counter moisturizer that Plaintiff was able to purchase at the correctional facility's commissary, and Plaintiff's occasional left shoulder pain which Plaintiff attributed to DOCCS policy requiring inmates housed in SHU be handcuffed through the cell door prior to being removed from the cell.  The objective prong of Plaintiff's deliberate indifference claim is thus satisfied only with regard to Plaintiff's complaints of hypertension, chest pain and eye pressure and, accordingly, it is these same three complaints to which the court limits its consideration of the subjective prong, *i.e.*, whether there is a material issue of fact as to whether Defendants acted with a sufficiently culpable state of mind in failing to adequately treat Plaintiff's hypertension, chest pain, and eye pressure.

A person acts with deliberate indifference to an inmate's health or safety only if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exits, and he must also draw the inference." *Farmer*, 511 U.S. at 837.  The requisite state of mind lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Id*. at 836.  It is the equivalent of recklessly disregarding a substantial risk of serious harm to the inmate. *Id*.  An inmate is not required to show that the official acted or failed to act believing that harm actually would befall an inmate; it is sufficient that the official acted or failed to act despite the official's knowledge of a substantial risk of serious harm. *Id*. at 837.  Supreme Court "'cases mandate inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment.'" *Id*. at 838 (quoting *Wilson v. Seiter*, 501 U.S. 294, 299 (1991)).  "But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under [Supreme Court] cases be condemned as the infliction of punishment." *Id*.  "The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or *so obvious that it should be known*." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994) (italics added) (citing W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 34, pp. 213-14 (5th ed. 1984); Restatement (Second) of Torts § 500 (1965)).

"In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate

health." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006). "Deliberate indifference is a mental state equivalent to subjective recklessness . . . . This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (internal citation omitted). Nevertheless, "[t]he defendant's belief that his conduct poses no risk of serious harm (or an insubstantial risk of serious harm) need not be sound so long as it is sincere." *Id.* at 281. Here, there are no undisputed issues of fact which, if decided in Plaintiff's favor, could establish the requisite subjectively culpable state of mind to hold Dr. Canfield, N.P. Fowler, Nurse Dyal-Weaer, or Nurse Administrator Felker liable for denying Plaintiff adequate medical care.

In particular, Plaintiff was regularly provided with medication for his high blood pressure, to wit, Ramipril, 5 mg per day, and was placed on a low cholesterol/low fat diet to further assist Plaintiff in controlling his blood pressure. Dr. Canfield Declaration ¶¶ 3-4. Plaintiff's blood pressure was regularly monitored at Southport. *Id.* ¶ 8. In April 2009, Plaintiff, at his request, was permitted to temporarily discontinue his hypertension medication but in June 2009, when Plaintiff's blood pressure was elevated at 153/81, N.P. Fowler encouraged Plaintiff to continue taking Ramipril. *Id.* ¶¶ 8, 10. Plaintiff's hypertension diagnosis was, for unknown reasons, inactivated on August 17, 2009 by Nurse Felker, who, on September 13, 2014, rectified the mistake. *Id.* ¶ 8. Accordingly, there is no evidence in the record that a reasonable jury could construe as establishing any Defendant had the requisite subjectively culpable state of mind with regard to Plaintiff's hypertension.

As for Plaintiff's complaints of chest pain and possible cardiovascular disease, Plaintiff was first examined in connection with complaints of mid-sternal pain at night on June 22, 2009, when N.P. Fowler found Plaintiff weighed 246 lbs., his blood pressure was elevated at 153/81, but without bruits in his carotid artery, his thyroid was within normal limits, heart rate and rhythm were normal and lungs were clear.  AHR at Bates 000113.  N.P. Fowler reviewed with Plaintiff his laboratory reports, discussed Plaintiff's treatment options, ordered additional laboratory tests, prescribed Zantac, and encouraged Plaintiff to continue taking Ramipril for hypertension.  *Id.*  Plaintiff's medical records further establish that aside from his hypertension, which was well-controlled with medication which was routinely prescribed, AHR at Bates 000111, 000113, 000114,  nothing supports Plaintiff's claim that he had cardiovascular disease but, rather, Plaintiff had no family history of cardiovascular disease, a chest X-ray on November 19, 2004 was normal, laboratory blood tests on June 25, 2009 showed Plaintiff's cholesterol and triglycerides within normal limits, and EKGs done on April 6, 2009 and October 9, 2009, were normal.  Dr. Canfield Declaration ¶ 8.  Accordingly, there is no evidence in the record on which a reasonable jury could find Defendants acted with subjective recklessness with regard to Plaintiff's complaints of chest pain and cardiovascular disease.

As for Plaintiff's complaints of bilateral eye pressure, the record establishes that an ophthalmological consultation to rule out glaucoma had been ordered for Plaintiff on December 18, 2008, prior to his transfer from Elmira to Southport, and occurred on February 23, 2009.  AHR at Bates 000134, 000190.  The ophthalmologist found Plaintiff's eye pressure to be within normal limits such that it was doubtful that the

bilateral eye pressure of which Plaintiff complained was caused by glaucoma. *Id.* at Bates 000190. Accordingly, no evidence in the record could support a reasonable jury's determination that Defendants acted with subjective recklessness in connection with Plaintiff's complaints of bilateral eye pressure.

On this record, a reasonable jury could find only that Defendants Dr.Canfield, N.P. Fowler, Nurse Dyal-Weaver, and Nurse Administrator Felker did not act with deliberate indifference to Plaintiff's serious medical needs. Summary judgment on Plaintiff's claims for relief asserting violations of his Eighth Amendment rights based on an alleged denial of medical care should be GRANTED.

## B.    Prison Conditions

Defendants are also entitled to summary judgment insofar as Plaintiff claims Eighth Amendment violations based on Defendants' alleged failure to provide him with adequate winter clothing and the continuous illumination of his cell. "While the Eighth Amendment's prohibition against cruel and unusual punishment 'does not mandate comfortable prisons,' the conditions must be at least 'humane.'" *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), and *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Specifically, with regard to Plaintiff's prison condition claims, "[u]nder the Eighth Amendment, States must not deprive prisoners of their 'basic human needs – *e.g.*, food, clothing, shelter, medical care, and reasonable safety.'" *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Helling v. McKinney*, 509 U.S. 25, 32 (1993)). "Ultimately, to establish the objective element of an Eighth Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency." *Id.* (quoting

*Helling*, 509 U.S. at 35).  With regard to the subjective requirement, "the Supreme Court has explained that 'a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts form which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"  *Id.* (quoting *Farmer*, 511 U.S. at 837).  Further, "'[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'"  *Id.* (quoting *Farmer*, 511 U.S. at 842).

Plaintiff specifically claims he was denied, pursuant to DOCCS Directive 4933,[22] winter boots, a thermos, and winter gloves to protect Plaintiff from inclement weather while he was housed in Southport's SHU during the winter months of December 2008 through February 2009.  Amended Complaint ¶ 96.  Without such items, Plaintiff maintains he was not able to exercise outside without experiencing pain in his hands and feet from exposure to the cold, and caught a head cold.  *Id.* ¶ 97.  According to Plaintiff, because DOCCS Directive 4933 bears LeClaire's signature as the approving authority, LeClaire is liable to Plaintiff for an Eighth Amendment violation based on the failure to provide Plaintiff with adequate winter clothing.

The denial of winter boots and gloves, however, objectively does not violate contemporary standards of decency.  Although without boots and gloves Plaintiff may be uncomfortable exercising outside when the temperature is cold, Plaintiff does not

---

[22] No copy of DOCCS Directive 4933 is in the record.

claim that he was forced to exercise outside, or that he was unable to exercise within his cell on such occasions.  Significantly, the denial of only out-of-cell exercise for a period of several weeks does not establish an Eighth Amendment violation provided an inmate may still exercise inside his cell.  *Phelan v. Zenzen*, 2012 WL 5420423, at *5 (W.D.N.Y. Nov. 6, 2012 (quoting *Dumpson v. Goord*, 2011 WL 4345760, at * 9 (W.D.N.Y. Sept. 15, 2011)).  In fact, Plaintiff has also failed to provide any evidence establishing that the outside temperature consistently was so cold as to require boots and gloves, such as historical weather data, and, as such, has failed to establish the objective element of this claim.  Nor does Plaintiff explain how the failure to provide Plaintiff with a thermos constituted a deprivation of a basic human need in violation of contemporary standards of decency.  *Phelps*, 308 F.3d at 185.  Plaintiff thus is unable to establish the objective element of his claim, and the court need not reach the subjective element.  *See Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (holding both the objective and subjective components of an Eighth Amendment claim challenging prison conditions must be established).  Accordingly, summary judgment should be GRANTED on this claim.

With regard to Plaintiff's assertion that his cell was illuminated 24 hours, preventing Plaintiff from sleeping, the Second Circuit recognizes that "sleep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment."  *Walker v. Schult*, 717 F.3d 116, 126 (2d Cir. 2013) (citing cases).  "Requiring inmates to live in constant illumination can. . . , under certain circumstances, rise to the level of an Eighth Amendment violation."  *Jones v. Rock*, 2013 WL 4804500, at * 10 (N.D.N.Y. sept. 6, 2013) (citing *Keenan v. Hall*, 83 F.3d 1083, 1090-91 (9th Cir.

1996), *amended on other grounds*, 135 F.3d 1318 (9th Cir. 1998)).  Courts' analyses of

Eighth Amendment claims based on continuous lighting within a prison setting are "'fact-

driven,' based upon the degree of illumination, the discomfort that it caused, and the

penological concern for the lighting." *Booker v. Maly*, 2014 WL 1289579, at * 18

(N.D.N.Y. Mar. 31, 2014) (citing cases).  Nevertheless, "to succeed on a claim of illegal

illumination, plaintiff must produce evidence that the constant illumination had harmful

effects on his health beyond mere discomfort." *Vasquez v. Frank*, 290 Fed.Appx. 927,

929 (W.D.Wis. Nov. 2, 2007) (affirming summary judgment on inmate plaintiff's Eighth

Amendment prison condition claim where medical records failed to substantiate any

causal link between cell conditions, including constant illumination with a single 9-watt

bulb, and inmate's alleged medical symptom of eye pain).

        In the instant case, not only has Plaintiff failed to describe, let alone presented

any substantiating evidence of, the cell illumination of which he complains, but Plaintiff

has also failed to allege that such illumination resulted in anything more than some

sleep deprivation which has consistently been held below the requisite severity for an

Eighth Amendment claim.  *See*, *e.g.*, *Jones v. Smith*, 2015 WL 5750136, at * 15

(N.D.N.Y. Sept. 30, 2015) (adopting report and recommendation that summary

judgment be granted on Eighth Amendment claim where inmate plaintiff' failed to allege

any serious health effects caused by sleep deprivation resulting from 13-watt night light

illuminating cell); and *Booker v. Maly*, 2014 WL 1289579, at * 19 (N.D.N.Y. Mar. 31,

2014) (adopting report and recommendation that summary judgment be granted

dismissing plaintiff inmate's Eighth Amendment claim based on 24-hour illumination of

prison cell where evidence established low wattage night light enabled corrections

officers to see into cell without further disturbing inmate, thereby furthering a legitimate,

penological interest, *e.g.*, helping keep safe both corrections staff and inmate).

Accordingly, Defendants' motion for summary judgment should be GRANTED insofar as

Plaintiff alleges an Eighth Amendment claim based on constant illumination of his cell.

**6.     Conspiracy Claim**

Plaintiff claims that "unknown confidential informants" conspired to deny Plaintiff

his Eighth and Fourteenth Amendment rights by repeatedly subjecting Plaintiff to

unfounded urinalyses to humiliate and sexually harass Plaintiff, lodging death threats

against Plaintiff, and conspiring to carry out such threats, and that Wenderlich conspired

with the confidential informants by refusing Plaintiff's request to view video surveillance

of the November 17, 2008 altercation, thereby interfering with Plaintiff's preparation of

his defense for the Disciplinary Hearing.  Amended Complaint, Sixth Cause of Action.

Defendants argue in support of summary judgment that this claim is barred by the intra-

corporate conspiracy doctrine, rooted in the conspiracy provision of Section One of the

Sherman Antitrust Act, 15 U.S.C. § 1, providing an entity cannot conspire with one or

more of its employees acting within the scope of employment.  Defendants'

Memorandum at 12-13.  In opposing summary judgment, Plaintiff argues the intra-

agency conspiracy doctrine does not apply to an allegation of conspiracy between an

entity's employees and a confidential informant, as alleged in the instant action.

Plaintiff's Memorandum at 14-15.  In further support of summary judgment, Defendants

maintain their research has revealed no case supporting Plaintiff's asserting that the

intra-agency conspiracy doctrine does not apply to an alleged conspiracy involving

confidential informants.  Defendants' Reply at 5.  The court need not address whether

the intra-agency conspiracy doctrine bars Plaintiff's claim because the conspiracy claim

fails on a more fundamental point as discussed below.

Although not specifically stated as such, Plaintiff's conspiracy claim is brought

pursuant to 42 U.S.C. § 1985(3) ("§ 1985(3)") which proscribes a conspiracy to deprive

a person of any rights or privileges under the laws.  The four elements of a § 1985(3)

claim include

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any
> person or class of persons of equal protection of the laws, or of equal privileges
> and immunities under the laws; (3) an act in furtherance of the conspiracy; (4)
> whereby a person is either injured in his person or property or deprived of any
> right of a citizen of the United States.  Furthermore, the conspiracy must also be
> motivated by 'some racial or perhaps otherwise class-based, invidious
> discriminatory animus behind the conspirators' actions.'

*Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1087-88 (2d Cir.
1993) (citing and quoting *United Bd. of Carpenters, Local 610 v. Scott*, 463 U.S. 825,
828-29 (1983)).

Significantly, in the instant case, the record is devoid of any evidence establishing the

requisite "racial or [ ] otherwise class-based invidious discriminatory animus" motive.

*See Harrison v. Lutheran Medical Center*, 468 Fed.Appx. 33, 37 (2d Cir. Mar. 14, 2014)

(citing *United Bd. of Carpenters, Local 610*, 463 U.S. at 828, in affirming district court's

dismissal for failure to state a claim § 1985(3) conspiracy claim in the absence of any

allegation of facts supporting requisite motive).

Summary judgment should be GRANTED in favor of Defendants insofar as

Plaintiff alleges a conspiracy under § 1985(3).

**7.    Supervisory Liability**

Defendants seek summary judgment on Plaintiff's claims against Defendants

Fischer, LeClaire, Bezio, Bradt, Napoli, Abrunzo, and Heath ("supervisory Defendants")

based on a theory of supervisory liability, asserting such claims are premised only on the fact that Plaintiff wrote letters, grievances, and complaints advising of the asserted constitutional violations which Plaintiff further maintains such supervisory Defendants failed to correct.  Defendants' Memorandum at 15-17.  In opposition to summary judgment, Plaintiff maintains that where a supervisory official is advised of a particular grievance yet fails to act in response, the supervisory official may be found to have sufficient personal involvement to establish individual liability for the alleged constitutional violation.  Plaintiff's Response at 17-18.  Defendants have not argued in further support of summary judgment on this claim.

"[S]upervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior*."  *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citing *Al-Jundi v. Estate of Rockfeller*, 885 F.2d 1060, 1065 (2d Cir. 1989)).  "Similarly, proof of 'linkage in the prison chain of command' is insufficient." *Id*. (citing *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)).  "'Absent some personal involvement by [the supervisory official] in the allegedly unlawful conduct of his subordinates,' he cannot be liable under section 1983.'"  *Id*. at 144-45 (quoting *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987)).  Even an imperfect investigation, without more, does not give rise to a constitutional violation.  *Friedman v. New York City Admin. for Children's Services*, 502 Fed.Appx. 23, 27 (2d Cir. Nov. 6, 2012) (citing *Wilkinson v. Russell*, 182 F.3d 89, 106 (2d Cir. 1999)).

In the instant case, should the District Judge agree with the recommendation that summary judgment be granted as to Plaintiff's claims, the dismissal of such claims

would render moot the related supervisory liability claims.  Accordingly, summary judgment should be GRANTED as to the supervisory Defendants.

## 8.    Motion to Dismiss Attorney

Plaintiff has complained to the undersigned that Plaintiff repeatedly has failed to receive legal mail from his court-appointed counsel, Reddy, which Plaintiff maintains has interfered with Plaintiff's meaningful participation in telephone calls with counsel. November 24, 2015 Letter at 1.  Significantly, Plaintiff asserts he wishes to raise several additional arguments in response to Defendant's summary judgment motion[23] and requests Reddy be dismissed as his counsel. *Id.* at 1-2.

In contrast to criminal cases, there is no constitutional requirement that an indigent litigant in a civil matter be appointed *pro bono* counsel, although a court has discretion to appoint counsel pursuant to 28 U.S.C. § 1915(e).  *Barnes v. Alves*, 10 F.Supp.3d 382, 384 (W.D.N.Y. 2014).  Court-appointed representation can, however, be dismissed even though the only alternative is self-representation.  *See Leftridge v. Conn. State Trooper Officer # 1283*, 640 F.3d 62, 67 (2d Cir. 2011) (requiring *pro se* plaintiff to proceed by counsel in a civil case violates 28 U.S.C. § 1654 which provides that in federal courts "the parties may plead and conduct their own cases personally"); *see also Norman v. Talcovitz*, 1996 WL 648970, at * 1 (S.D.N.Y. Nov. 7, 1996) (observing that plaintiff "has dismissed his court-appointed counsel and is now proceeding *pro se.* . . .").  Nevertheless, as discussed in connection with Plaintiff's earlier motion seeking dismissal of court-appointed counsel, January 30, 2014 D&O at 7-8, Plaintiff, by requesting assignment of counsel, waived his right to self-

---

[23] Plaintiff has not explained what such arguments are, but characterizes them as "meritorious." November 24, 2015 Letter at 2.

representation and does not have an unfettered right to demand such court-appointed counsel be discharged and return to his *pro se* status absent grounds establishing Plaintiff's assigned counsel has failed to act with reasonable diligence and competence in prosecuting Plaintiff's case.  *Id.* (citing *Taylor v. Dickel*, 293 F.3d 427, 431-32 (8th Cir. 2002) (appointment of counsel pursuant to § 1915(e) does not permit party to demand court discharge such counsel and revert to *pro se* status)).

In the instant case, although Plaintiff has requested his court-appointed counsel be dismissed, Plaintiff has not asked the court to appoint substitute counsel such that the dismissal of Reddy would result in Plaintiff reverting to his *pro se* status.  As with the earlier request for dismissal of court-appointed counsel, January 30, 2014 D&O at 7-8, however, Plaintiff again has provided no grounds supporting a determination that there has been a fundamental breakdown in communications or cooperation with Reddy, or that Reddy has been less than diligent in her representation of Plaintiff and prosecution of his case; rather, Plaintiff attributes his dissatisfaction with his court-appointed counsel not to any actions by Reddy, but to difficulties with the correctional facility's legal mail and telephone policies.  Accordingly, Plaintiff's request that his court-appointed counsel be dismissed is DENIED.

## <u>CONCLUSION</u>

Based on the foregoing, Defendants' motion (Doc. No. 112), should be

GRANTED, and the Clerk of the Court should be directed to close the file; Plaintiff's

motion (Doc. No. 125), is DENIED.

SO ORDERED as to Plaintiff's motion,

/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

Respectfully submitted as to Defendants' motion,

/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      February 10, 2016
            Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      February 10, 2016
            Buffalo, New York